

"UNDER SEAL"

FILED
CHARLOTTE, NC

NOV 15 2022

US DISTRICT COURT
WESTERN DISTRICT OF NC

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | DOCKET NO. 3:22-CR-266 |
| ) | |
| v. ) | **BILL OF INDICTMENT** |
| ) | |
| **WYNN A.D. CHARLEBOIS** ) | Violations: |
| ) | 18 U.S.C. § 1343 |
| ) | 18 U.S.C. § 1957 |
| ) | |

## THE GRAND JURY CHARGES:

At the specified times and at all relevant times:

### Introductory Allegations

1. From in or around 2015 through at least October 2022, the defendant, WYNN A.D. CHARLEBOIS, engaged in a fraudulent investment scheme. CHARLEBOIS, through his companies including WC Private, Wilcox Hybrid, Damon Investments, and others, sought funds from investors as purported loans, subscription agreements, co-investments, and participation investments. In the investment agreements, CHARLEBOIS fraudulently asserted that he and his entities held stock options for particular companies and that the investors could help purchase the options and gain specified profits.

2. More than 39 individuals and entities invested more than $6.9 million into entities controlled by CHARLEBOIS. Contrary to CHARLEBOIS's representations, the investors' money was not used to invest as purported in the agreements resulting in losses to those investors exceeding $5.3 million. CHARLEBOIS generally spent investor funds to make Ponzi-style payments to other investors and on personal expenses such as private school tuition, travel, restaurants, and other personal purchases.

### Background

3. CHARLEBOIS was a resident of Charlotte, North Carolina.

4. CHARLEBOIS was the owner and member of various companies including Wilcox Hybrid LP, WC Hybrid LP, WC Private LLC, Damon Advisors LLC, Damon Investments LLC, Hamilton Advisors LLC, Norton Asset Management LLC, Norton Fund LP, SL Loan Guarantee LLC, and WC Technology LLC (together "the WC Entities").

5. CHARLEBOIS was the managing member and general partner of Wilcox Opportunity Fund, L.P., which purported to be a security that offered investment shares.

CHARLEBOIS would direct investors to roll over IRA and 401k investments into the Wilcox Opportunity Fund.

## The Investment Fraud Scheme

6.  From in or around 2015 through in or about October 2022, CHARLEBOIS engaged in a scheme and artifice to defraud victims by making a series of false and fraudulent representations and deceptive half-truths of material fact, and concealing material information, about investments and loans.

7.  During the years 2018 through 2022, CHARLEBOIS and his entities collected more than $9.5 million in bank deposits from various individuals and entities.

8.  In furtherance of the scheme to defraud, CHARLEBOIS recruited victim investors, including friends, family members, and social acquaintances, and promised risk-free investments and loans.

9.  In furtherance of the scheme to defraud, CHARLEBOIS provided false and fraudulent documents on behalf of himself, the WC Entities, and other investments, purporting to set out the terms of the financial agreements. CHARLEBOIS generally provided these documents to his victim investors electronically. CHARLEBOIS used a variety of sham investments, agreements, and loans to trick victim investors. CHARLEBOIS did not use the victim's funds as set out in the investment, agreement, and loan documents. For example:

   a.  **Co-investment Agreements.** CHARLEBOIS provided victim investors with purported Co-Investment Agreements which provided that an investor would invest a certain dollar amount with a WC Entity. The investment would purportedly be used for an investment in a stock purchase of shares of a particular company. The investment would be conditioned upon terms that the WC entity would return proceeds of a specified amount to the investor by a date certain. CHARLEBOIS would sign the document and personally guarantee the payment. CHARLEBOIS did not use the victim's funds as set out in the co-investment agreements. For example:

      i.  On or about April 13, 2021, Victim D.H. and Wilcox Hybrid entered into a Co-Investment Agreement in which Victim D.H. would invest $200,000 with Wilcox Hybrid for purported investment in stock purchase of shares of Company A conditioned upon the terms that Wilcox would return proceeds of $270,600 to D.H. no later than June 30, 2021. The agreement was signed by CHARLEBOIS and was personally guaranteed by CHARLEBOIS. CHARLEBOIS did not use Victim D.H.'s funds for a stock purchase.

   b.  **Subscription Agreements with the W.C. Entities.** CHARLEBOIS provided victim investors with purported Subscription Agreements which provided that an investor, "the Subscriber," would enter an agreement with a WC Entity. Through the agreement, the investor would purchase membership interest in the WC Entity in the form of a number of units in the WC Entity based on a specific capital investment. CHARLEBOIS did not use the victim's funds as set out in subscription agreements. For example:

2

i.       On or about November 12, 2019, Victim J.C., as Subscriber, purchased 2 ½ Units in WC Technology LLC for $25,000. The agreement was signed by CHARLEBOIS as managing member and by Victim J.C. An exhibit to the purchase, Exhibit A, provided that the Subscriber took a position in WC Technology to participate in the purchase of ownership shares of Company B. CHARLEBOIS did not use Victim J.C.'s funds as provided in the subscription agreement.

c.      **Participation Agreements**. CHARLEBOIS provided victim investors with purported Participation Agreements which provided that an investor would invest with a WC entity and that such an investment would nominally represent a certain number of shares in a particular company through an option share purchase agreement. CHARLEBOIS would personally guarantee the agreement. CHARLEBOIS did not use the victim's funds as set out in the participation agreements. For example:

i.       On or about November 4, 2021, CHARLEBOIS, through WC Private LLC, and Victim S.H. entered a Participation Investment Agreement whereby WC Private agreed to purchase stock options in Company C for a 30.6% gain. Victim S.H. agreed to invest $100,000, and WC Private agreed to wire proceeds to Investor S.H. in the amount of $130,554.25 no later than January 15, 2022. CHARLEBOIS and WC Private fully and personally guaranteed the payment to Investor S.H. CHARLEBOIS did not use Victim S.H.'s funds to purchase stock options.

d.      **Loans**. CHARLEBOIS provided victim investors with Loan Agreements with a WC Entity as the borrower and an Investor as the Lender. The WC Entity would request that the Investor extend credit to the WC Entity in exchange for a promissory note. The promissory note would set out the principal amount of the loan as well as the interest rate associated with the loan as well as payment and interest terms. CHARLEBOIS did not use the victim's funds as set out in the loan documents. For example:

i.       On or about December 1, 2021, WC Private LLC, as borrower, and Victim J.C.2, as lender, entered into a loan agreement whereby WC Private LLC borrowed $50,000, with a maturity date of no later than March 31, 2022, from Victim J.C.2 in exchange for a ten percent interest rate. Per the loan agreement, WC Private LLC was to use the loan proceeds to make a series of investments totaling approximately $1,000,000 into specified third-party businesses. As part of the loan agreement, WC Private LLC falsely represented to own various assets, including equity positions in these businesses, among others. CHARLEBOIS personally guaranteed the loan. However, CHARLEBOIS used most of these funds to make Ponzi-style payments and on personal expenditures.

10.     In furtherance of the scheme to defraud, the agreements and loans contained false and misleading representations about material matters, including falsified and forged documents purporting to be on behalf of the third-party businesses and that CHARLEBOIS would personally guarantee each investor's initial investment.

11. In furtherance of the scheme to defraud, CHARLEBOIS directed the victims to wire their investment and loan funds to WC Entity bank accounts and to CHARLEBOIS's personal bank accounts at various federally insured financial institutions.

12. As part of the fraudulent scheme, and contrary to the representations made to investors, very little, if any, investor money was actually used as specified in CHARLEBOIS's agreements with investors. Rather, a significant amount of investor funds was used to make Ponzi-style payments to other investors and on personal expenses. For example, a review of at least $10 million in deposits into CHARLEBOIS and his entities' bank accounts from 2018 through 2022 showed CHARLEBOIS paid out funds, including:

   a. Over $6 million in Ponzi-style payments to previous investors, including payments to investors who provided funds to CHARLEBOIS and his entities prior to 2018;

   b. Over $173,000 in payments to Southern Methodist University;

   c. Over $155,000 in payments to Charlotte Country Day School;

   d. Over $150,000 in cash withdrawals;

   e. Over $170,000 in payments for travel and luxury vacations including in Colorado and Florida;

   f. Over $131,000 in payments for CHARLEBOIS's personal mortgage;

   g. Over $350,000 in transfers to bank accounts of CHARLEBOIS's family members;

   h. Over $400,000 in payments for everyday expenses, including over $150,000 in payments to Charlotte area restaurants, over $32,000 in payments to Harris Teeter, and over $30,000 in payments to gas stations; and

   i. Over $680,000 in repayments on short-term loans taken by CHARLEBOIS.

13. In furtherance of the scheme to defraud, when investors tried to obtain the purported returns from CHARLEBOIS and his companies and when they requested their money back and their scheduled payments, CHARLEBOIS would make false and fraudulent statements about his inability to make payments. For example, CHARLEBOIS would falsely state that the bank transfer was taking longer than it was supposed to and make other excuses.

### Examples of Specific Fraudulent Investments and Use of Funds

14. **Victim D.H.** On or about April 13, 2021 Victim D.H. wired $200,000 to Wilcox Hybrid, LP Account *7266 at Bank of America pursuant to a Co-Investment Agreement by which Wilcox Hybrid agreed to use the funds to purchase certain specified options. The funds were not invested; instead, the funds were used as follows:

a. CHARLEBOIS used some of the funds to pay back earlier investors by transferring at least $65,000 in two wires labeled "Trade Distributions" to two earlier victim investors.

b. Additionally, CHARLEBOIS transferred more than $100,000 that same day to CHARLEBOIS's personal bank account at Bank of America, Account *9387. Of the funds transferred to Account *9387, CHARLEBOIS subsequently used approximately $65,000 to transfer to yet another victim investor purportedly for "Wilcox Yield Purchase." CHARLEBOIS used approximately $29,340.84 from personal account *9387 to make a college tuition payment to Southern Methodist University, among other personal expenses.

15. **Victim J.C.** On or about November 12, 2019, entities of Victim J.C. wired $50,000 total through two separate $25,000 transfers to WC Technology bank account *8498 at Bank of America pursuant to Subscription Agreements with WC Technology. The funds were not invested; instead, the funds were used as follows:

a. On or about November 12, 2019, CHARLEBOIS transferred $50,000, through a $40,000 and a $10,000 transaction, to CHARLEBOIS's personal bank account at Bank of America, Account *9387.

b. CHARLEBOIS subsequently used $32,762.71 of those funds on November 12, 2019 to make a payment to PHH Mortgage Services on CHARLEBOIS's personal mortgage and used $1,043.54 of those funds on November 12, 2019 to make a payment to Morrison Smith Jewelers.

16. **Victim R.T.** On or about November 10, 2020, Victim R.T. wired $40,000 to Wilcox Hybrid bank account *7266 at Bank of America purportedly for the purchase of stock options in Company A. The funds were not used to purchase stock options; instead the funds were used as follows:

a. On or about November 10, 2020, CHARLEBOIS transferred $38,000, to CHARLEBOIS's personal bank account at Bank of America Account *9387.

b. CHARLEBOIS subsequently used $17,500 of those funds on November 10, 2020 to make a payment to Land Rover Dallas.

17. **Victim N.C.** On or about August 13, 2021, Victim N.C. wired $20,000 to CHARLEBOIS's bank account *9387 at Bank of America purportedly as an investment. The funds were not used for an investment; instead, the funds were used as follows:

a. On or about August 16, 2021, CHARLESBOIS used $10,914.64 of those funds to make a payment to Charlotte Country Day.

5

# COUNT ONE
18 U.S.C. § 1343
(Wire Fraud)

18. Paragraphs 1 through 17 of this Bill of Indictment are re-alleged and incorporated by reference as though fully set forth herein.

19. From no later than 2015 through at least October 2022, in Mecklenburg County, within the Western District of North Carolina and elsewhere, the defendant,

## WYNN A.D. CHARLEBOIS

with the intent to defraud, did knowingly and intentionally devise the above described scheme and artifice to defraud investors and obtain money from investors by materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such scheme and artifice, did cause to be transmitted by means of wire communications in interstate commerce any writing, signal, or sound, in that, among other things, the defendant sent and caused to be sent electronic communications and electronic financial transactions in interstate commerce.

All in violation of Title 18, United States Code, Section 1343.

## COUNTS TWO THROUGH SEVEN
(Engaging in Monetary Transactions in Criminally Derived Property)

20. Paragraphs 1 through 17 of this Bill of Indictment are re-alleged and incorporated by reference as though fully set forth herein.

21. On or about the dates set out in the chart below, in the Western District of North Carolina and elsewhere, the defendant,

**WYNN A.D. CHARLEBOIS**

did knowingly engage and attempt to engage in monetary transactions by, through and to financial institutions, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, the transactions described in the chart below, such property having been derived from a specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343:

| COUNT | DATE | AMOUNT | DESCRIPTION OF TRANSACTION |
|---|---|---|---|
| TWO | 11/12/2019 | $32,762.71 | Payment from BOA *9387 to PHH Mortgage Services |
| THREE | 5/27/2020 | $12,066.14 | Payment from BOA *9387 to Sea Scape Properties |
| FOUR | 8/13/2020 | $10,493.00 | Payment from BOA *9387 to Charlotte Country Day School |
| FIVE | 11/10/2020 | $17,500.00 | Payment from BOA *9387 to Land Rover Dallas for "Charlebois purchase" |
| SIX | 4/14/2021 | $29,340.84 | Payment from BOA *9387 to Southern Methodist University |
| SEVEN | 8/16/2021 | $10,914.64 | Payment from BOA *9387 to Charlotte Country Day School |

All in violation of Title 18, United States Code, Section 1957.

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

   a. All property which constitutes or is derived from proceeds of the violations set forth in Count One of this Bill of Indictment;

   b. All property involved in such violations or traceable to property involved in such violations; and

   c. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a).

The Grand Jury finds probable cause that the following property is subject to forfeiture on one or more of the grounds stated above:

   a. A forfeiture money judgment in the amount of at least $5,385,260.98, such amount constituting the proceeds of the violations set forth in Count One.

A TRUE BILL:

FOREPERSON

DENA J. KING
UNITED STATES ATTORNEY

JENNY SUGAR
ASSISTANT UNITED STATES ATTORNEY