UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:22-CR-266-DCN |
| | ) | |
| v. | ) | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| | ) | |
| **WYNN A.D. CHARLEBOIS** | ) | |
| | ) | |

COMES NOW the United States of America, by and through Russ Ferguson, United States Attorney for the Western District of North Carolina, and respectfully requests that the Court sentence Defendant to a term of imprisonment within the range of 78 to 97 months, which the Government asserts is the correctly calculated Guideline range. Such a sentence would be sufficient, but not greater than necessary, to fulfill the goals of sentencing given the nature of Defendant's crimes and their significant impact on his victims, and it would be in line with recent sentences imposed by courts in this District on similarly-situated defendants.

### I. DEFENDANT'S CRIMES

For nearly seven years, the Defendant engaged in a fraudulent Ponzi scheme relating to various entities he controlled, including WC Private, Wilcox Hybrid, Wilcox Opportunity Fund, and Damon Investments. During the course of the scheme, Defendant lied to dozens of victims, falsely representing that his entities were successful investment vehicles earning significant investment returns for their clients, promising clients outsized returns, and providing them with worthless personal guarantees. But, Defendant's entities were not successful investment vehicles and the promises of outside

1

returns and personal guarantees were hollow. Regardless of in which of Defendants' entities investors believed they were investing, Defendant generally did not use investors' money to invest as promised; rather, nearly all investor funds were used to make Ponzi-style payments to other investors and on extravagant personal expenses for Defendant and his family, such as mortgage payments, luxury travel, meals, private school and college tuition, and luxury cars. Over the course of at least seven years, Defendant took in more than $7.5 million from more than 40 investors around the country, including several that were in or nearing retirement, before collapsing in the fall of 2022. Defendant's scheme caused investors to suffer approximately $6 million in losses.

Defendant held himself out as a self-made investor, hedge fund manager, and a consultant to private businesses. He used his past employment at a reputable hedge fund and his respected status in the local community to con his victims into trusting him with their hard-earned savings. He preyed upon his family, friends, fellow church members, neighbors, and the parents of his children's friends. His crimes caused economic, psychological, reputational and emotional damage to his victims, the full extent of which may never be known.

Although Defendant was sued by certain investors in various state courts in the years leading up to his scheme's collapse and the Securities and Exchange Commission (SEC) in May 2022, these lawsuits did not stop him from committing additional fraud. Indeed, Defendant continued to tell lies and solicit additional funds even after the SEC accused him of running a Ponzi scheme. In so doing, Defendant lied about the SEC's

lawsuit and his own conduct that led to it. Defendant likely would have continued to defraud additional victims if he had not been indicted.

Defendant lied to certain victims about opportunities to invest with him in the stock options of other successful companies, which Defendant claimed to have obtained in exchange for consulting services he had provided to those companies. To carry out this part of his scheme, Defendant fabricated numerous documents and forged the signature of representatives of those other successful companies, including, in one instance, the signature of his long-time friend.

To other victims, Defendant represented that certain of his entities, including the Wilcox Opportunity Fund, LP ("Opportunity Fund") and WC Hybrid LP ("WC Hybrid") were successful hedge funds that invested in other types of securities, and he sold certain victims limited partnership units in these investments. For example, as shown in the images below,[1] Defendant caused certain victims to invest in the Opportunity Fund through their retirement accounts, and he caused third party custodial firms to issue statements to these victims reflecting the fabricated value of these investments in their accounts.

> In keeping with Exchange Act Rule 17a-13 this document has been prepared to verify that the information on E*TRADE's books and records match your information. In addition, in accordance with the requirements of Securities Exchange Act Rule 15c3-3, by executing below, you confirm on behalf of the issuer(s), that the customer's interest in the position(s) listed below shall not be subject to any right, charge, security interest, lien, or claim of any kind in favor of the General Partner or any person claiming through the General Partner.

---

[1] USA-00018580; USA-00000011



Similarly, Defendant sent victims his own accounts statements purporting to show the value of their investments in the Opportunity Fund as exemplified below:[2]

---

[2] USA-00018795

4

Case 3:22-cr-00266-DCN-SCR    Document 39    Filed 09/30/25    Page 4 of 15



Defendant created the Opportunity Fund in or around July 2006. According to the Limited Partnership Agreement, which was executed by Defendant, "The Principal purpose of the Partnership shall be to purchase, invest, hold, sell, trade and otherwise deal with and in Securities."[3] Defendant represented to victims that he managed this fund through another entity and that he would receive management fees and performance/incentive fees as his compensation for that.[4] Similarly, in the Private Placement Memorandum for the Opportunity Fund, Defendant disclosed that, while the "General Partner is not registered as an investment adviser under the Investment Advisers Act of 1940, … the General Partner or an affiliate may in the future register as an investment adviser under the Advisers Act." (All caps removed)[5]

Similarly, when soliciting investments for WC Hybrid, Defendant described it as "a private investment partnership ('Fund') investing in long/short public securities, and

---

[3] USA-00018642
[4] *Id.*
[5] USA-00018669

to a lesser degree, private investments" that would generate "returns" by, in part, "performance of the fund." The Fund is managed by Wynn Charlebois."[6] As with the Opportunity Fund, Defendant falsely claimed that he would be compensated by charging WC Hybrid a "management fee" through his "management company, WC Management LLC."[7]

Defendant used entities like the Opportunity Fund and WC Hybrid to portray a level of sophistication to his victims and to give them comfort about the safety of their investments. For example, by setting these entities up to appear as hedge funds managed by an investment adviser like he held himself out to be, he was able to get third party custodial firms like E-Trade and American IRA to send statements to his customers representing that the value of their investments was growing. Several victims had no idea their investments were worthless until approached by law enforcement.

## II. PSR CALCULATIONS AND OBJECTIONS

After Defendant pleaded guilty, the Probation Office prepared a Final Presentence Report (PSR). Doc. 34. As explained below, it correctly declined to adopt Defendant's objection to the four-level investment adviser enhancement under U.S.S.G. § 2B1.1(b)(20)(A)(iii) and, thus, properly calculated his Adjusted Offense Level as 31 and his Criminal History Category as a I (Doc. 34 at ¶ 59 and page 24).[8] That said, the PSR incorrectly included the two-level reduction for certain zero-point offenders under

---

[6] USA-00020759
[7] *Id.*
[8] The United States explained why this enhancement was correctly applied in its Response to Defendant's Objections to the PSR (Doc. 33), which it incorporates by reference herein.

6

U.S.S.G. § 4C1.1. As discussed below, Defendant does not qualify for this reduction because he "personally cause[d] one or more of his victims to suffer substantial financial hardship." *See* U.S.S.G. § 4C1.1(a)(6). Without the application of the zero-point offender reduction, Defendant's Total Offense Level would be a 28 with a resulting advisory guideline range of 78 to 97 months.

Defendant caused several of his victims to suffer substantial financial hardship. This is clear from the restitution amounts in the PSR and from the victim impact statements submitted. For example, as set forth in Paragraph 47 of the PSR, at least 16 victims each suffered losses of more than $100,000, including nine who each suffered more than $200,000 in losses. Of these, one victim suffered close to $2 million in losses and three others each suffered approximately $500,000 in losses. While there is a relative element to whether a loss causes "substantial financial hardship" to any particular victim, there are very few people in the country who would not suffer substantial financial hardship from losing hundreds of thousands of dollars. *See, e.g., United States v. Minhas*, 850 F.3d 873, 876-79 (7th Cir. 2017) (court may draw reasonable inferences about the victims' financial circumstances and about their level of financial harm, so long as those inferences find some support in the record, including victim impact statements, and finding no error in district court's reasoning that losses of more than $2,000 were "a lot of money for a working person"); *United States v. Foster*, 2025 U.S. Dist. LEXIS 8246 at *9 (E.D.V.A. Jan. 15, 2025) ("that [victim] did not suffer a devastating loss does not mean that he did not suffer a substantial hardship" by losing $40,000).

But the Court need not rely solely on the size of the losses because certain victims have already described the specific financial hardships Defendant caused them to suffer. One victim reported the loss of funds set aside for their grandchildren's college fund. Doc. 34-1 at 3. Another reported losing "a substantial amount of our net worth," which "destroyed our savings for our daughter's education." *Id*. at 4. One couple victimized by Defendant reported the loss of "all of our retirement savings" and their "daughter's college tuition savings.[9] These are precisely the types of financial hardship the Guidelines and Courts have found to be "substantial." Indeed, the commentary to U.S.S.G. § 2B1.1, which is incorporated by reference into the commentary to U.S.S.G. § 4C1, provides a non-exhaustive list of factors for the court to consider, including whether a victim suffered "substantial loss of a retirement, education, or other savings or investment fund." U.S.S.G. § 2B1.1 cmt. n.4(F)(iii); *see also United States v. Hanson*, 124 F.4th 1013, 1016 (6th Cir. 2025) (collecting cases and finding that court could apply enhancement based upon extrapolation from total number of victims and losses or individual circumstances of a victim).

The Court has before it sufficient evidence that Defendant caused at least one of his victims to suffer substantial financial hardship because he caused a substantial loss of retirement, education, and other savings accounts, but, if necessary, the United States anticipates that there will be at least one victim present at the sentencing who can recount the economic he and his family suffered at the hands of the Defendant.

---

[9] *See* Victim letter submitted September 23, 2025.

8

Case 3:22-cr-00266-DCN-SCR    Document 39    Filed 09/30/25    Page 8 of 15

## III. SENTENCING PROCEDURE

In determining the appropriate sentence, "a district court must begin by correctly calculating the applicable Guidelines range." *United States v. Evans*, 526 F.3d 155, 160 (4th Cir. 2008). The advisory Guidelines are "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice. . . . [I]t is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007). "[A] Guidelines sentence will usually be reasonable, because it reflects both the Commission's and the sentencing court's judgment as to what is an appropriate sentence for a given offender." *Id.* at 351. While the post-*Booker* sentencing regime affords the sentencing court discretion in selecting the appropriate sentence, "[a]s a matter of administration and to secure nationwide consistency, the advisory Guidelines should be the starting point and the initial benchmark" in determining the appropriate sentence. *Gall*, 522 U.S. at 49. The Fourth Circuit has stated it even more strongly, describing the Guideline offense level as "the *crucial* 'starting point,' as well as the 'initial benchmark'" in the sentencing process. *United States v. Lewis*, 606 F.3d 193, 199 (4th Cir. 2010) (quoting *Gall*, 522 U.S. at 49) (emphasis added).

Ultimately, however, the appropriate sentence is for the District Court to determine based on the factors enumerated in 18 U.S.C. § 3553(a), and "any sentence, within or outside of the Guidelines range, as a result of a departure or of a variance, must

9

be reviewed by appellate courts for reasonableness pursuant to an abuse of discretion standard." *United States v. Diosdado-Star*, 630 F.3d 359, 365 (4th Cir. 2011).

## IV. THE § 3553(a) FACTORS DICTATE A HEAVY SENTENCE

The factors set forth in 18 U.S.C. § 3553(a) dictate a significant sentence of between 78 to 97 months, which the Government maintains would be within the properly calculated Guidelines range for Defendant. As explained below, imposition of such a substantial sentence on Defendant is consistent with all the relevant § 3553(a) factors.

### A. Nature and Circumstances of the Offense

The nature and circumstances of the offense are terrible. Defendant lied and lied and lied to his family, friends, and neighbors. Defendant does not appear to have needed the money; he had a successful career prior to starting his fraud. Rather, it appears his crime was fueled by greed. Defendant took the hard-earned savings of others and blew it on luxuries for himself and his family such as private school tuition, luxury travel, cars, and restaurants. As set forth above, some of Defendant's victims suffered substantial economic hardship from his crimes. Certainly, others did not. But all his victims are left dealing with the emotional and psychological toll of his deceit. Several victims reported knowing Defendant for decades, and many victims reported damaged relationships between each other and with others because of Defendant's fraud. The Government anticipates that the Court will hear directly from some of these victims during the sentencing hearing.

Defendant's crimes were not an aberration, nor a one-time lapse in judgment. Rather, they constituted a pervasive, systematic, and well thought-out course of conduct

10

over several years. Defendant's scheme required deceit, cunning, and persistence. He told numerous lies along the way, and he stole from victims in amounts ranging from a few thousand to a few million dollars. In other words, he stole from anybody he could (more than 40 victims), including professional investors, former classmates, neighbors, social acquaintances, veterans, and retirees. Incredibly, he used his reputation, his innate ability to garner people's trust, and his disturbing capacity for telling lies to keep the truth hidden. Even when the truth became to surface in the form of private lawsuits and an SEC enforcement action, Defendant continued to lie and solicit additional funds from victims. Sadly, for many, this delayed reckoning simply allowed Defendant to squander the hard-earned savings of more innocent people who invested right before the scheme collapsed. Defendant did not just push lies through marketing materials or a website. To the contrary, in many cases Defendant sat in people's homes, looked them in the eyes, and told lies about why they should trust him with their money.

Defendant's sentence must recognize the extensive harm wrought by his fraud.

### B. History and Characteristics of Defendant

Like many white collar defendants, Defendant is intelligent and charismatic. As noted above, before his crimes were discovered, Defendant was well respected within the community. But Defendant abused that trust and used his intellect and charisma to defraud the innocent. He had no problem deceiving those who respected and admired him to line his pockets with their money. Defendant often manipulated his victims by claiming he was doing a favor for them by letting them invest in such lucrative

11

investment opportunities that he obtained through his own hard work and business acumen, when, in reality, he was simply cheating them.

Also like many white collar defendants, Defendant appears to have a loving family, including a wife and children, who were both beneficiaries and victims of his fraud. For example, he spent a significant portion of his criminal proceeds on private school tuition for his children. This must be extremely tough for the victims from whom he stole their education savings. Moreover, Defendant used his access to the social networks surrounding his children's private education to find additional victims, which certainly must have negatively impacted their lives, and he directly victimized at least one member of his extended family.

Defendant's history and characteristics show a healthy, successful, and educated man who garnered the trust of his friends, neighbors, former coworkers, and social acquaintances, and who then abused those relationships, lying without remorse to expand his wallet. They also reflect a man blessed with a family whom he victimized directly and indirectly. Thus, Defendant's history and characteristics also warrant a significant sentence.

### C. Adequate Deterrence, Protection of the Public, Promoting Respect for the Law, and Avoiding Unwarranted Sentencing Disparities

A significant prison sentence is necessary to deter Defendant and others, to protect the public from further crimes of Defendant, and to promote respect for the law. Fraud schemes such as this require specific and general deterrence that only can be

12

accomplished through lengthy periods of incarceration. Longer sentences deter recidivism and promote respect for the law.

As to general deterrence, as the Eleventh Circuit has noted, "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.* at 1227. Put differently, as the Seventh Circuit has explained, "[t]he system of penalties under the Guidelines is constructed on the belief that . . . longer sentences of imprisonment, are more effective deterrents. A large body of evidence supports this intuition." *United States v. Turner*, 998 F.2d 534, 536 (7th Cir. 1993).

Moreover, as evidenced by the length and scope of Defendant's fraudulent scheme, cases such as this can be very difficult to detect and stop early. Where offenses are lucrative and difficult to detect and punish, general deterrence is key. *See United States v. Morgan*, 635 F. Appx. 423, 450 (10th Cir. 2015) ("Deterrence is a crucial factor in sentencing decisions for economic and public corruption crimes…"); *United States v. Hayes*, 762 F.3d 1300, 1308 (11th Cir. 2014) ("In a number of opinions … we have explained that general deterrence is an important factor in white-collar cases, where the motivation is greed.").The Fourth Circuit has explicitly recognized the importance of incarceration for defendants convicted of white collar crimes such as tax evasion, theft, fraud and embezzlement. *See United States v. Engle*, 592 F3.d 495, 501 (4th Cir. 2010).

13

Thus, a significant sentence is necessary to protect the public from Defendant and to deter others from using their reputation and community connections to betray the trust of friends and neighbors and preying on investors. It would also promote respect for the law by demonstrating that crimes causing substantial harm will be treated similarly. A sentence of between 78 to 97 months would send the message courts in this District have recognized as necessary in these types of cases. Indeed, other architects of similar fraudulent investment schemes who pleaded guilty in this District routinely receive sentences within the advisory Guidelines.

## V. CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of between 78 to 97 months.

Respectfully submitted this the 30th day of September, 2025 by:

>RUSS FERGUSON
>UNITED STATES ATTORNEY
>
>*/s/ Daniel Ryan*
>Assistant United States Attorney
>United States Attorney's Office
>IL Bar 6279737
>227 West Trade Street, Suite 1650
>Charlotte, N.C. 28202
>Telephone: (704) 338-6222
>E-mail: Daniel.ryan@usdoj.gov

14

## ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certify that:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: September 30, 2025

/s/ Daniel Ryan
*Assistant United States Attorney*